IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JOHN KNOTTS,                                          No. 3:15-cv-02296-AC

        Plaintiff,

    v.

OREGON TRAIL SCHOOL DISTRICT          OPINION & ORDER
46, WADE LOCKETT, in his individual
and official capacity, AARON BAYER, in
his individual and official capacity, and
KIM BALL, in her individual and official
capacity,

        Defendants.

Justin Steffen
STEFFEN LEGAL SERVICES, LLC
2027 SE Jefferson Street, Suite 205A
Milwaukie, Oregon 97222

    Attorney for Plaintiff


/ / /

/ / /


1 - OPINION & ORDER

Haley Percell
OREGON SCHOOL BOARDS ASSOCIATION
1201 Court Street NE, Suite 400
Salem, Oregon 97301

Attorney for Defendants

HERNANDEZ, District Judge:

Magistrate Judge Acosta issued a Findings & Recommendation (#41) on July 26, 2017, in which he recommends the Court deny Plaintiff's motion for summary judgment and grant Defendants' motion for summary judgment. Plaintiff has timely filed objections to the Findings & Recommendation. The matter is now before me pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b).

When any party objects to any portion of the Magistrate Judge's Findings & Recommendation, the district court must make a *de novo* determination of that portion of the Magistrate Judge's report. 28 U.S.C. § 636(b)(1); *Dawson v. Marshall*, 561 F.3d 930, 932 (9th Cir. 2009); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc). I have carefully considered Plaintiff's objections and Defendants' response to the objections. I agree with Plaintiff that the Magistrate Judge erred and thus, I decline to adopt the Findings & Recommendation.

The background of the dispute is set forth in Judge Acosta's July 26, 2017 Findings & Recommendation (the F&R). Plaintiff, a frequent spectator at Sandy High School athletic events, made statements while attending those events which included language Defendants contend is inappropriate. Plaintiff also expressed other opinions which Defendants found

objectionable[1] as set forth in the F&R.  In response, Defendants directed Plaintiff to refrain from attending Sandy athletic events on two occasions, initially for two weeks and then for six months.

Judge Acosta concluded that some of Plaintiff's statements were not constitutionally protected.  F&R at 12-8.  He further determined that some of Defendants' actions would deter a "'person of ordinary firmness from future First Amendment activities.'" *Id.* at 22-23 (quoting *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)).  He also found that assuming all of Plaintiff's speech was protected, the evidence did not establish that Defendants' actions were based on the content of Plaintiff's speech or the viewpoints he expressed.  *Id.* at 18-22.

In his objections to the F&R, Plaintiff argues that Judge Acosta erred by concluding that (1) some of Plaintiff's speech was not constitutionally protected, (2) Defendants' actions were viewpoint neutral, (3) there was no genuine issue of material fact as to whether Plaintiff's language was vulgar or offensive; and (4) Defendants' actions were not intended to chill a person's speech and would not actually do so.  Plaintiff argues that because of these errors, Judge Acosta improperly granted Defendants' summary judgment motion and denied Plaintiff's motion.  I agree with Plaintiff that Defendants' motion should be denied.  However, I reject Plaintiff's contention that the errors require that summary judgment be granted to Plaintiff.

Plaintiff alleges that Defendants retaliated against him for the exercise of his free speech rights under the First Amendment.  First Am. Compl. ¶ 11; ECF 14.  He contends that in response to "denigrating" comments he made about Oregon Trail School District staff or policies,

---

[1]  Whether Defendants objected to the statements because of the manner in which they were expressed or because of their content is in dispute.

and in response to a discussion he had with an opposing football coach, he was excluded from

school events, threatened with being arrested, charged with trespassing, and faced the possibility

of reporting to the principal each time he attempted to enter school property. *Id.* Plaintiff's claim

is *not* a generalized First Amendment claim in which he alleges, for example, that Defendants'

banning him from the property violated a constitutional right to enter school property. *E.g.*,

*Lovern v. Edwards*, 190 F.3d 648, 655-56 (4th Cir. 1999) (rejecting the claim that school

administrators must provide parents with "boundless access" to school property); *Van Deelen v.*

*Shawnee Mission Unified Sch. Dist.*, 316 F. Supp. 2d 1052, 1057 (D. Kan. 2004) (indicating that

parents do not have a constitutional right to enter a school); *see also Kugler v. Bd. of Educ. of*

*City of Chicago*, No. 16 C 8305, 2017 WL 3581176, at *7 (N.D. Ill. Aug. 18, 2017) (plaintiff

union representative conceded he did not have a "substantive right" to enter school board

property "as a constitutional matter"). Plaintiff's more limited claim contends that in response to

his expression of certain opinions, Defendants denied him the valuable benefit of watching high

school sports activities, a benefit it offers to the public.

To establish a First Amendment retaliation claim, a non-prisoner, non-government

employee, private citizen plaintiff must show that (1) he or she engaged in constitutionally

protected speech; (2) the defendants' actions "would chill a person of ordinary firmness from

continuing to engage in the protected activity"; and (3) the protected activity was a substantial or

motivating factor in the defendants' conduct. *E.g.*, *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d

755, 770 (9th Cir. 2006); *see also Pearson v. Cent. Curry Sch. Dist. No. 1*, No.

6:15-CV-1353-AA, 2015 WL 5665457, at *3 (D. Or. Sept. 22, 2015) (citing *Pinard* standard in

case where parents of student brought a First Amendment retaliation claim against school

district).  Judge Acosta recited the appropriate standards.  F&R at 12.[2]

I.  Constitutionally Protected Speech

Judge Acosta began his discussion by analyzing the first element of whether Plaintiff's speech was constitutionally protected.  Relying on a "forum analysis" and a determination that schools are not public fora, Judge Acosta wrote that "Defendants' actions in response to Knotts's conduct need be only reasonable in light of the purpose served by the school and viewpoint neutral to be permissible."  *Id.* at 13.  Judge Acosta was correct that Plaintiff did not establish Sandy High School as a public forum and thus, it is either a limited public forum or a nonpublic forum.  But, he erred in applying a forum analysis to a retaliation claim.

The cases Judge Acosta cited address generalized First Amendment claims, not retaliation claims.  *Grayned v. City of Rockford* considered a claim that city ordinances restricting protests near a high school violated the First Amendment.  408 U.S. 104 (1970).  One ordinance regulated picketing activity and the other regulated noise.  *Id.* at 107.  After being convicted of violating both ordinances during a demonstration at the high school, the defendant/appellant challenged the ordinances' constitutionality.  *Id.* at 106.  Relying on *Police Department of Chicago v. Mosley*, 408 U.S. 92 (1970), a decision the Court issued the same day, the *Grayned* Court found that the picketing ordinance violated the Equal Protection Clause.  *Id.* at 107. The Court rejected the defendant's argument that the noise regulation ordinance was vague and overbroad and thus,

---

[2]  Instead of describing the third element as a "substantial or motivating factor," Judge Acosta stated the element as "an intent to chill" the protected speech.  F&R at 12.  Later, in the section of the F&R discussing this element, it is clear he was referring to the "substantial or motivating factor" standard.  F&R at 18 ("To establish the requisite intent to chill protected speech, a plaintiff must show that deterrence of the protected speech was a substantial or motivating factor in the defendant's conduct.") (internal quotation marks and brackets omitted).

it rejected his claim that the ordinance was in violation of the First Amendment. *Id.* This was not a First Amendment retaliation claim. Instead, it was a facial challenge to city policies.

Similarly, in *Flint v. Dennison*, 488 F.3d 816 (9th Cir. 2007), the next case cited by Judge Acosta, the Ninth Circuit considered a facial attack to a school policy that restricted student campaign expenditures. Other cases cited in the F&R raise similar attacks on government policies. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) (addressing the ability of schools and educators to exercise editorial control over the style and content of student speech in school-sponsored expressive activities consistent with the First Amendment; no retaliation claim involved); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985) (challenge to executive order governing the participation of agencies in federal Combined Federal Campaign which specifically excluded legal defense and political advocacy organizations; no retaliation claim presented); *PeTA, People for the Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198 (10th Cir. 2002) (challenge to constitutionality of a statute; no First Amendment retaliation claim made); *DiLoreto v. Downey Unifed Sch. Dist. Bd. of Educ.*, 196 F.3d 958 (9th Cir. 1999) (challenge to school district practices regulating advertisements on baseball field; no retaliation claim); *State v. Carr*, 215 Or. App. 306, 314, 170 P.3d 563, 568 (2007) (challenge to state criminal trespass statute after arrest on school property; court noted that "[d]efendant does not argue that the principal's restriction on his speech was unreasonable. Rather, he argues that the principal had no lawful authority to restrict his speech at all"; no retaliation claim brought).

A recent Fourth Circuit case expressly stated that "the public forum framework is not the appropriate frame of analysis in the Free Speech retaliation context." *Buxton v. Kurtinitis*, 862 F.3d 423, 428 (4th Cir. 2017) (noting that the plaintiff had "not pointed to a single case in which

a court applied—as he requests here—forum analysis to a Free Speech *retaliation* claim").  The *Buxton* court explained that "public forum cases deal with the government restricting access to a forum—i.e., preventing the speech from happening altogether . . . [whereas] retaliation claims arise after the speech has already happened, presumably after the speaker has gained access to the forum in question." *Id.* (citation omitted).  "Excluding a speaker from participating and retaliating against the speaker for his speech are two different actions, to which we apply different analytical frameworks." *Id.*

A forum analysis would be appropriate if, for example, Plaintiff challenged the District's policy of disallowing "'[a]busive language or actions toward any players, officials, coaches, or other fans' at athletic events.'" *See* F&R at 2 (quoting from pre-game announcement for Northwest Athletic Conference games read routinely at Sandy athletic events).  Because that is not the nature of his claim, the forum analysis is not applicable here.  Plaintiff's claim is that separate from the contours of the policy, Defendants retaliated against him because of the particular statements he made and the opinions he expressed.  That is a different type of claim.

That's not to say that the significance of the school location is immaterial.  Although the language of the First Amendment may appear to offer absolute protection, it has long been recognized that "[t]here are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942) (listing such categories as lewd, obscene, profane, libelous, and "insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace."); *see also United States v. Alvarez*, 567 U.S. 709, 717–18 (2012) (listing the "historic and traditional categories [of

expression] long familiar to the bar for which content-based restrictions on speech have been permitted" as: (1) advocacy intended, and likely, to incite imminent lawless action, (2) obscenity, (3) defamation, (4) "so-called 'fighting words,'" (5) child pornography, (6) fraud, (7) true threats, and (8) speech presenting some grave and imminent threat the government has the power to prevent)); *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011) (citing *Chaplinsky* for the proposition that "some speech, such as fighting words and obscenity, is not protected by the First Amendment at all.").

One category omitted from the list recited in *Alvarez*, but included in *Chaplinsky*, is profanity. Cases indicate that whether profane speech is constitutionally protected may in fact depend on its context and thus, it is not categorically protected or categorically unprotected. *See Bonnell v. Lorenzo*, 241 F.3d 800, 821 (6th Cir. 2001) ("it has long been held that despite the sanctity of the First Amendment, speech that is vulgar or profane is not entitled to absolute constitutional protection") (citing *FCC v. Pacifica Foundation*, 438 U.S. 726, 747 (1978)). For example, profanity as political expression when communicated in a courthouse is protected speech. *Cohen v. California*, 403 U.S. 15 (1971) (state could not, consistent with the First Amendment, punish the defendant for wearing a jacket which bore the words "Fuck the Draft" in a courthouse). And, profanity-laced criticism of police officers is also protected speech. *E.g.*, *United States v. Poocha*, 259 F.3d 1077 (9th Cir. 2001) (defendant's utterance of "fuck you" or "that's fucked" to National Park Service ranger was constitutionally protected).

In contrast, profane and vulgar speech is not protected in the school setting. *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675 (1986). Judge Acosta recognized that under *Bethel*, schools, in order to protect minors from exposure to "vulgar and offensive spoken language," may restrict

the use of lewd, vulgar, and profane language.  F&R at 14 (discussing *Bethel*, 478 U.S. at 684

(citing *Pacifica Foundation*, 438 U.S. at 748-51 (government's prohibition of radio broadcast of

monologue which depicted sexual and excretory activities in a patently offensive manner at a

time when children were undoubtedly in the audience was constitutionally permissible))); *see

also B.H. ex rel. Hawk v. Easxton Area Sch. Dist.*, 725 F.3d 293, 319 (3d Cir. 2013) ("Under

[*Bethel School District v.*] *Fraser*, a school may categorically restrict plainly lewd, vulgar, or

profane speech . . . regardless of whether it can plausibly be interpreted as commenting on social

or political issues").

The Ninth Circuit has held that "school officials may suppress speech that is vulgar, lewd,

obscene, or plainly offensive without a showing that such speech occurred during a

school-sponsored event."  *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 529 (9th Cir. 1992)

(holding that discipline of students for wearing buttons referring to "scabs" in support of striking

teachers, was inconsistent with students' First Amendment rights).  Additionally, speech which

would "substantially disrupt, or materially interfere with, school activities" is also not entitled to

constitutional protection.  *Id.* (citing *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S.

503, 514 (1969) (wearing armband to school in protest of the Vietnam War was protected speech

when it did not cause substantial disruption or interference with school activities)).

Although most of these cases deal with student speech, the conclusions reached are

rooted in concerns regarding the challenged expression's impact on minors and the disruption to

or interference with school activity.  *E.g.*, *Tinker*, 393 U.S. at 513-14 (discussing ability of school

to regulate student expression on school property in the absence of material and substantial

disruption to the work and discipline of the school); *Pacifica*, 438 U.S. at 750-51 (noting that

timing of the broadcast was when children would be present, emphasizing that "broadcasting is uniquely accessible to children," and referring to the "government's interest in the well-being of its youth"); *Bethel*, 478 U.S. 683-84 (Court stressed the vulnerability of a "less mature audience," including some "only 14 years old," to offensive speech) (citing *Ginsberg v. New York*, 390 U.S. 629 (Court upheld a state statute banning the sale of sexually oriented material to minors, even though the material in question was entitled to First Amendment protection with respect to adults)).  These concerns are equally implicated by parent or third-party speech at school activities.  Thus, they appropriately govern the question of whether Plaintiff's statements were constitutionally protected.  *See Lovern*, 190 F.3d at 655 ("School officials . . . have the authority and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property.").

Here, three of Plaintiff's "statements" were made at high school athletic events, which are school activities and which Judge Acosta rightly observed "are commonly attended by the families of the participants, including younger siblings, as well as by other high school students and the high school students participating in the event."  F&R at 16.  I examine each of the three statements at issue to determine if any are constitutionally protected.

The first of three statements on school property occurred on May 2, 2014.  Plaintiff walked by the coaches of the freshman baseball team and said "next time you see [varsity coach] Rick Martin, tell him he's a 'fricking idiot' or 'prick.'"  F&R at 3.  According to Defendant Wade Lockett, the Sandy High School Athletic Director, Plaintiff told the coaches to tell Martin that Martin was a "fucking prick."  Steffen Decl. Ex. 6 at 3 (Locket Resp. to Pl. Interrog. No. 1), ECF 31-6.  In deposition, Lockett suggested that Plaintiff's comment included the words "prick or a

frickin' idiot." Steffen Decl. Ex. 1 ("Lockett Dep.") 11:13-16, ECF 31-1. Plaintiff states that he told the freshman coaches to tell Martin that Martin was a "fricking idiot." Percell Decl. Ex. 9 ("Pl. Dep.") 85:9-12, 21-23, ECF 33-9. "Prick" or "fucking" are lewd, vulgar, or profane.[3] While the vulgarity of "fricking idiot" is less obvious, the word "fricking" is a common euphemism for "fucking" and is best treated as a synonym. *See* OED Online, https://en.oxforddictionaries.com/definition/fricking (stating that "fricking" is "[u]sed for emphasis or to express anger, annoyance, contempt, or surprise" and that it originated in the 1930s as a euphemism for fucking). Another online resource indicates that while "fricking" could be viewed as a euphemism for "freaking," "freaking" is itself a "euphemism" for "fucking." https://en.wiktionary.org/wiki/freaking. Thus, Plaintiff's comment about Martin to the freshman team coaches on May 2, 2014 is lewd, vulgar, or profane no matter whose version of the

---

[3] "Lewd" is defined as "sexually unchaste or licentious" or "suggestive of or tending to moral looseness," "inciting to sensual desire or imagination[.]" *Webster's Third New Int'l Dictionary, Unabridged* 1301 (2002) (hereinafter "*Webster's*"). In the online Oxford English Dictionary, it is defined as "[c]rude and offensive in a sexual way." https://en.oxforddictionaries.com/definition/lewd (hereinafter "Online OED").

"Vulgar" is defined, as relevant here, to mean "morally crude" or "marked by coarseness of speech or expression[.]; *Webster's* at 2566. Alternatively, it means "[m]aking explicit and offensive reference to sex or bodily functions; coarse and rude." Online OED, https://en.oxforddictionaries.com/definition/vulgar

"Profane" means "to debase by a wrong, unworthy, or vulgar use[.]" *Webster's* at 1810. It also means, in regard to language, "blasphemous or obscene." Online OED,. https://en.oxforddictionaries.com/definition/profane

"Prick," while having several meanings, was clearly meant derogatorily and no reasonable juror could conclude that the reference is to anything other than "penis." *Webster's* at 1798 (noting one definition for the word as "penis" and which is usually considered vulgar). The Online OED also notes that the vulgar and slang use of the word refers to a "man's penis" or a "stupid or contemptible man. " https://en.oxforddictionaries.com/definition/prick.

statement is credited.[4]

Although the comment was directed to the freshman team coaches who are young adults and not minors, the description of where this statement was made puts it squarely in the realm of a school activity implicating the school's legitimate concerns about exposing minors to such language. Lockett testified that as Plaintiff was leaving the game on that date, he spoke to the freshman coaches. Lockett Dep. 10:22-24-11:1. In his Interrogatory Responses, Lockett explained that Plaintiff's grandson was playing on the Sandy Junior Varsity baseball team at a game held at Milwaukie High School. Steffen Decl. Ex. 6 at 3 (Lockett Resp. to Pl. Interrog. No. 1). The freshman team was also playing there. *Id.* To get to the parking lot, visiting spectators such as Plaintiff must walk directly past the freshman field visiting dugout (meaning the dugout for the Sandy team on that occasion). *Id.* As Plaintiff was leaving, he spoke to the freshman coaches in that dugout. *Id.* Given that he was on school property, the coaches were still present, and presumably so were the student team members, *Fraser* applies and directs a finding that Plaintiff's statement to the coaches about Martin was not protected.

The second occasion to consider is May 23, 2014 when Plaintiff attended a baseball playoff game and made a comment to a parent in which Plaintiff referred to a player as a "son of a bitch." F&R at 4 ("Knotts attended a play-off baseball game at Sandy and commented to a

---

[4] In his objections to the F&R, Plaintiff argues that the determination of whether Plaintiff's language was vulgar or offensive is a question of fact for the jury. Pl. Objs. 4, ECF 43. Plaintiff cites no authority for this contention. He does not appear to have made this argument or cited any relevant authority for it in his briefing submitted in support of his summary judgment motion and in opposition to Defendants' motion. Even if the determination is an issue for the jury, no reasonable juror could conclude that the words "prick," "fucking," or "fricking idiot" used in this context are anything other than lewd, vulgar, or profane. Thus, I make this determination as a matter of law.

Sandy parent in a sharp and aggressive tone, 'Did you see that son of a bitch throw that bat 30 feet?,' referring to a Sandy baseball player.").  In his Interrogatory Responses, Lockett described the occasion this way:

> At the conclusion of the game, as visiting spectators were walking towards the parking lot, Mr. Knotts engaged Mike Lovely (a parent of a SHS baseball player) in a conversation in the parking lot adjacent to the field.  Mr. Lockett was approximately thirty feet away from Mr. Knotts and could hear him say something to the effect of "that God-damned fucking ___!"  (The minor student/SHS baseball player Mr. Knotts named has been intentionally omitted to comply with student privacy laws).  Mr. Knotts' tone was sharp and aggressive.  There were many players, parents, students and other visitors present who may have heard him.

Steffen Decl. Ex. 6 at 3-4 (Lockett Resp. to Pl. Interrog. No. 2).  Lockett's deposition testimony about what Plaintiff said is consistent with his Interrogatory Response.  Lockett Dep. 15:4-10.  In his own deposition, Plaintiff testified that his statement was:  "Did you see that son of a bitch throw that bat 30 feet?"  Pl. Dep. 95:18-23.  In deposition Lockett acknowledged that Plaintiff's conversation was "private" in that it was between "person A and person B," but he explained that "persons D through Z" could hear it.  Lockett Dep. 15:13-19.  Plaintiff does not dispute that Lockett and others heard him speaking to the parent.

Regardless of whether Plaintiff's statement referred to the student player as a "son of a bitch" or included the words "goddamned fucking," there is no issue of fact that these words used in this context are lewd, vulgar, or profane.  Additionally, the comment was made in a public area at a school sporting event.  It is not constitutionally protected speech.

The third statement occurring on school property was in the Fall of 2015 when Plaintiff attended a Sandy High School football game.  During the game, Defendant Kim Ball, Sandy High School's Principal, observed Plaintiff approach an assistant coach from the opposing team

and hand him a piece of paper.  F&R at 6.  Plaintiff said something like "give this a try" or "this will do good for you."  *Id.*  Ball questioned the assistant coach about the content of the conversation and asked for the piece of paper given to him by Plaintiff.  *Id.*  The assistant coach told Ball that Plaintiff wanted to talk about football.  *Id.*  Ball approached Plaintiff to question him.  *Id.*  Plaintiff explained that he had known a few of the opposing coaches for years and wanted to talk with them and give them a play.  *Id.*  Ball was concerned that the information given by Plaintiff could be harmful to the Sandy football players.  *Id.*  She asked Plaintiff to leave the game.  *Id.*  Plaintiff did not and Ball took no further action.  *Id.*

Judge Acosta concluded that Plaintiff's statements to the opposing coach at the football game "could be viewed as protected speech" because there is no evidence that they were abusive or offensive.  I agree with Judge Acosta that the communication is constitutionally protected because there is no evidence to show that Plaintiff's expression on that occasion was lewd, vulgar, or profane.  Moreover, by handing the coach a slip of paper, the communication does not implicate any concerns of exposing minors to offensive language.

In addition to these three instances of statements made on school property, the record contains evidence of other statements by Plaintiff.  In April 2014, Plaintiff spoke to the mother of a baseball player and made extensive derogatory comments about the Sandy High School baseball program and coaches.  F&R at 3.  There is no evidence that this was anything but a private conversation, not on school property.  Around that time, he also spoke to parents of players of the Sandy High School and Sherwood baseball teams, speaking poorly of a particular player's father and making derogatory comments about the baseball program.  Again, there is no evidence that this occurred in the presence of players, students, or other minors.  There is also no

evidence that these statements included any lewd, vulgar, profane, or obscene language.

Later in May 2014, after the incident in which Plaintiff spoke to the freshman coaches about Martin, and after Lockett banned Plaintiff from attending baseball games at Sandy through the rest of the season, Plaintiff left Lockett a voicemail containing derogatory and inflammatory statements regarding Lockett personally and Sandy generally. This was a private "conversation" between adults and there is no evidence that the language was lewd, vulgar, profane, or obscene.

Judge Acosta stated that the comments "reported to Lockett in mid-April by Sandy parents" could be viewed as protected speech. F&R at 18. He also found the statements by Plaintiff to Lockett left on Lockett's voicemail to be "arguably protected speech." *Id.* I agree that these derogatory comments made to the parents and to Lockett about the baseball program, about a player's father, about Lockett, and about Sandy generally are protected speech as the record fails to show that they contained lewd, vulgar, or profane language or were anything but private conversations.

## II. Acts That Chill or Silence

The second element in the three-part retaliation analysis is whether Defendants' actions "'would chill or silence a person of ordinary firmness from future First Amendment activities.'" F&R at 22 (quoting *Mendocinio*, 192 F.3d at 1300). After Plaintiff made his May 2, 2014 remarks to the freshman coaches, and after receiving additional complaints about Plaintiff's behavior, Lockett asked Plaintiff to refrain from attending baseball games throughout the remainder of the season. *Id.* at 4. After the May 23, 2014 comments about the Sandy baseball player, Lockett banned Plaintiff from Oregon Trail School District Property for six months, through November 29, 2014, the end of the fall sports season. *Id.* at 4-5. Ball requested Plaintiff

leave the Fall 2015 football game after Plaintiff passed the note to the opposing coaching staff. *Id.* at 6. And, in response to a letter from Plaintiff's counsel regarding how the issues between the parties could be resolved amicably, Defendant Superintendent Aaron Bayer stated that pursuant to the District's policies, Plaintiff would be required to check in with the main office if he came onto campus during school hours and he "may need to talk to the Principal." *Id.* at 8.

Judge Acosta properly noted that in analyzing whether these actions would chill or silence a person of ordinary firmness from continued First Amendment activities, evidence that Plaintiff was not deterred or his refusal to comply with directives is not relevant or indicative of the effect the directives would have on a person of ordinary firmness. *Id.* at 22. Judge Acosta concluded that Lockett's banning Plaintiff from attending baseball games for the rest of the 2014 season and the exclusion from District property for six months would chill or silence a person of ordinary firmness from future First Amendment activities. However, he concluded that Ball's request that Plaintiff leave the football game in the Fall of 2015 and Bayer's indication that Plaintiff may need to meet with the school principal upon visiting the school during the "check-in process" would not meet the "chill a person of ordinary firmness" standard.

Plaintiff objects to the conclusion regarding Ball's request. Plaintiff notes that Judge Acosta failed to account for the intimidation created by Ball having brought a security guard with her when she asked Plaintiff to leave. In her deposition, Ball testified that she decided to talk to Plaintiff after she witnessed him talk to the opposing assistant coach, she talked to that coach, and she obtained the piece of paper with the football play on it that Plaintiff had given to that coach. Steffen Decl. Ex. 5 ("Ball Dep.") 10-12, ECF 31-5. She wanted to talk to Plaintiff to determine "his intent." *Id.* at 12:14-16. She asked one of the school's security staff to

accompany her and be within "reasonable proximity" because she was not sure "how this is going to go." *Id.* at 13:17-22.  She was concerned because "we have a history at this point of him being – using profane language, being kind of inflammatory in general." *Id.* at 13:23-25-14:1-3.  Ball acknowledged  that Plaintiff had never been accused by the District of assaulting anyone. *Id.* at 13:4-9.

I agree with Plaintiff that Judge Acosta erred in concluding that Ball's directive that Plaintiff leave the game made with security personnel present, would not chill a person of ordinary firmness from future First Amendment activity.  The security presence could be intimidating.  Whether a person of ordinary firmness would be chilled by Ball's action from engaging in future protected activity is a question of fact.  *See Richardson v. City of Gladstone*, No. 3:14-CV-00588-ST, 2015 WL 569914, at *13 (D. Or. Feb. 10, 2015) (explaining that defendants' argument that their alleged conduct would not chill a person of ordinary firmness from exercising his free speech rights involved a question of fact which could not be resolved on motion to dismiss).  Because reasonable jurors could conclude that Ball's actions with the security staff present could chill the exercise of protected expression, Judge Acosta erred in reaching a contrary conclusion on summary judgment.

III.  Intent to Chill Protected Speech/Substantial or Motivating Factor

In analyzing the third element of the claim, whether Plaintiff's protected speech was a substantial or motivating factor in the actions Defendants took against him, Judge Acosta relied heavily on Lockett's contentions that he did not ban Plaintiff from school property because of the content of his speech or the viewpoints he expressed but instead, his actions were based on the manner and environment in which Plaintiff  communicated, as well as on the effect it could have

on those hearing Plaintiff's comments.  F&R at 19-20.  Judge Acosta initially noted Lockett's testimony about the May 2, 2014 statement that Plaintiff made to the freshman team coaches about Martin.  *Id.* (quoting Lockett Dep. 11:7-21, 45:17-46:3).  There, Lockett characterized Plaintiff's as "relatively aggressive" who made "an aggressive statement" which he found inappropriate.  *Id.*  Lockett noted that Plaintiff used "aggressive language" to tell the coaches to "relay a message" to Martin.  *Id.*

Judge Acosta characterized this testimony as emphasizing the aggressive nature of the comments, not the content of the speech.  *Id.* at 20.  But, Lockett's testimony is actually unclear as to whether his "aggressive" reference is to the *manner* of Plaintiff's speech or to its *content*.  Lockett's descriptions of the communication as "aggressive language" and "aggressive enough language" seem to refer to the content of the speech and not to an aggressive manner which might be better described as yelling, pointing a finger, standing too close, etc.

Next, Judge Acosta relied on Lockett's testimony describing the May 23, 2014 comments about the Sandy baseball player where, according to Lockett, Plaintiff said something to the effect of "'goddamn fucking blank in reference to a student.'"  *Id.* (quoting Locket Dep. 15:4-7).  Lockett was asked whether this concerned him "because other people could hear the conversation or do you think it is inappropriate for him to share that opinion with other parents?"  *Id.*  He responded initially that he felt it was "inappropriate for him to share that opinion with other people."  *Id.*  This refers to the *content* of Plaintiff's speech.  Lockett continued, however, and explained that he found the environment to be inappropriate and the "aggressive nature of the comment in the environment we were in."  *Id.*  He continued by stating that parents were "pouring out of" the stands into the parking lot and everyone "is walking by that particular spot."

*Id.* Lockett believed that kids should not be subject to this "type of verbal assault." *Id.*

Judge Acosta found it notable that Lockett took no action against Plaintiff after receiving complaints from Sandy parents that Plaintiff was making derogatory statements about the parents, Sandy baseball coaches, and the Sandy baseball program. F&R at 19. Judge Acosta remarked that had Lockett "wanted to restrict Knotts's negative views of the Sandy coaches and baseball program, he could have banned Knotts at this time." *Id.* The fact that he did not, and that later, he did not react to the derogatory and inflammatory comments left by Plaintiff on Lockett's voicemail, was, according to Judge Acosta, "evidence Lockett did not intend to chill speech expressing Knotts's point of view, but rather the environment and manner in which Knotts expressed those views." F&R at 21 (further noting that because students were not exposed to the voicemail comments, Lockett's concerns about the environment and manner of the comments were not implicated and "he allowed Knotts the opportunity to express those views without reprisal.").

Although Judge Acosta's conclusion is not an unreasonable interpretation of the evidence, it is not the only one. Moreover, the discussion fails to cite to relevant evidence in the record and thus fails to acknowledge that the record supports more than one reasonable interpretation. As such, summary judgment is not warranted for either party.

In his deposition, Lockett explained that on May 5, 2014, he told Plaintiff to stay away from the baseball games for the rest of the season following the comments Plaintiff made to the freshman coaches about Martin which "came on the heels of two reports from other parents at a time that had been made to feel uncomfortable with conversations that he'd had . . . ." Lockett Dep. 12:21-24. This testimony can be understood to mean that Lockett banned Plaintiff from

games for the rest of the season because of both communications - the statement he made about Martin *and* the statements Plaintiff had made to parents.  The latter is protected expression.  And, as discussed above, Lockett's deposition testimony can be read to support a conclusion that Lockett was reacting to the content of Plaintiff's comment about Martin, not just to the manner or location in which it was made.

This is further borne out by looking at the May 28, 2014 letter Lockett sent to Plaintiff when he excluded Plaintiff from District property for six months.  There, Lockett wrote:

> On or around May 6, 2014 you and I had a phone conversation whereby you were directed to not show up to any Sandy High School events for the remainder of the Spring season (specifically, baseball games).  This directive came as the result of 2 previous conversations regarding the use of profane language *along with the derogation of Sandy High School athletics programs and coaches*.

Steffen Decl., Ex. 2, ECF 31-2 (emphasis added).  In this letter, Lockett himself states that his decision to ban Plaintiff from baseball games through the end of the season was based on Plaintiff's profane language *and* the more general derogation of Sandy athletics and coaches.  If there were any doubt about what instances of derogation Lockett was referring to, he explained in his Interrogatory Responses that the "derogation of Sandy High School athletics programs and coaches" referred to the complaints he received in April 2014 from parents about statements Plaintiff made regarding the baseball program and its coaches.  Steffen Decl. Ex. 6 at 4-5 (Lockett Resp. to Pl. Interrog. No. 3).

In the May 28, 2014 letter, Lockett explained that after having been directed to avoid Sandy baseball games for the rest of the season, Plaintiff attended a playoff game on May 23, 2014 and "again used profane language and derogated another player on the team."  Steffen Decl. Ex. 2.  Lockett then informed Plaintiff he was being excluded from District property with a

Trespass Warning, through November 29, 2014, as a "result of violating the directive to stay off of campus through the end of the Spring season *along with the continued derogation and disrespect of Sandy High School's coaches, players, and athletic programs in general*[.]" *Id.* (emphasis added). A reasonable juror could view Lockett's own explanation for his actions, made at the time of the exclusion, as based on Plaintiff's protected communications to parents and to Lockett.

Clearly, Plaintiff's profane, lewd, and vulgar statements are not protected and thus, to the extent Defendants' actions were motivated by that specific language, Defendants did not violate Plaintiff's First Amendment rights. But, the record, when viewed in a light most favorable to Plaintiff, creates an issue of fact regarding Lockett's motives. Evidence can be interpreted to support a conclusion that Lockett was reacting to the *content* of Plaintiff's communications, including constitutionally protected communications made directly to parents and Lockett. There is a reasonable inference to be drawn from the record that Plaintiff was banned and excluded because he was bad mouthing school personnel, coaches, and players which, outside of using profane, lewd, or vulgar speech, he was entitled to do.

As to Ball's conduct, Judge Acosta concluded that Ball's request that Plaintiff leave the Fall 2015 game was motivated by her concerns for players. F&R at 21. She was worried that "Knotts's actions during the middle of a football game could have put the Sandy football players in jeopardy." *Id.* Although Ball represented that it would have been appropriate for Plaintiff to meet with the opposing coaches at other times to share ideas about football plays, she believed that giving a play to the opposing coach during middle of the game was suspicious. *Id.* Thus, Judge Acosta concluded that "Ball intended to restrict only the environment in which the

discussion occurred - in the middle of a high school football game - not the content of the discussion." *Id.*

As with the conclusion about Lockett's motivation, Judge Acosta's conclusion about Ball's intent is not an unreasonable interpretation of the evidence. However, the record is susceptible to more than one reasonable conclusion about Ball's actions. First, it is undisputed that Ball approached the opposing coach and asked about the *content* of Plaintiff's communication. Ball Dep. 10:20-25-11:-12. If Ball were concerned only that Plaintiff was talking to an opposing coach during the game, the content of the conversation would have been irrelevant. Second, it is unclear how Plaintiff leaving the game at Ball's directive would have allayed her concerns. The play was handed to the coach who looked at it. If Ball were concerned about the opposing team implementing the play during the game, discussing that issue with the opposing team coach, which she did not do, is the more reasonable response. Ball Dep. 14:20-25-15:1-17. She had no evidence that the opposing team coach would use the play. *Id.* And, if she were concerned about Plaintiff continuing to give plays to the opposing team, she could have asked Plaintiff to refrain from further communications with the opposing team coaches during the game. It is unclear how excluding him from the remainder of the game addressed her purported safety concerns. Because these are reasonable conclusions drawn from the evidence, a jury could determine that Ball's request that Plaintiff leave the game was motivated by something other than her concern for student safety.

Given that the evidence in the record can be reasonably construed to reach opposing conclusions regarding Lockett's and Ball's motives, granting summary judgment to Defendants was error. It also means that Plaintiff is also not entitled to summary judgment on his claim.

IV.  Qualified Immunity & Municipal Liability

Defendants' motion included an argument that the individual Defendants are entitled to summary judgment based on qualified immunity.  Defendants also argued that the District was entitled to summary judgment because Plaintiff failed to identify a policy, custom, or practice of the District required to impose municipal liability in a 42 U.S.C. § 1983 claim.  Because of his conclusion that Plaintiff failed to establish that Defendants violated his First Amendment free speech rights, Judge Acosta declined to address these arguments.  F&R at 24.

A.  Qualified Immunity

"Whether qualified immunity is warranted involves a two part inquiry:  (1) whether the facts alleged by the plaintiff make out a violation of a constitutional right and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged misconduct."  *Woodward v. City of Tucson*, No. 16-15784, 2017 WL 4080477, at *7 (9th Cir. Sept. 15, 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  As to the first issue, for the reasons discussed above, it cannot be determined on summary judgment whether Plaintiff's rights were actually violated.

As to the second issue, a court examines "'whether the violative nature of particular conduct is clearly established' by controlling precedent, not whether the conduct violates a general principle of law."  *Sharp v. Cty. of Orange*, No. 15-56146, 2017 WL 4126947, at *7 (9th Cir. Sept. 19, 2017) (quoting *Mullenix v. Luna*, ⸺ U.S. ⸺, 136 S. Ct. 305, 308 (2015) (per curiam)).  For the purposes of this Opinion only, I assume that Defendants banned Plaintiff from baseball games and excluded him from District property because of his negative opinions and complaints made to parents and to Lockett about Sandy athletics and coaches, all of which is

constitutionally protected speech. The law is clearly established that government retaliation against a person for unquestionably constitutionally protected opinions, even when those opinions are objectionable, violates the First Amendment. Accordingly, Defendants are not entitled to qualified immunity.

B. Municipal Liability

Plaintiff has created an issue of fact regarding the District's custom, policy, or practice based on Bayer's deposition testimony and his position as Superintendent. Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), municipalities may be subject to damages under § 1983 when the plaintiff was injured pursuant to (1) an expressly adopted official policy, (2) a long-standing practice or custom, or (3) the decision of a "final policymaker." *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1066 (9th Cir. 2013).

Bayer approved of Lockett's decision to exclude Plaintiff from District property for six months. Steffen Decl. Ex. 3 ("Bayer Dep.") 6:19-22. Bayer approved the letter sent by Lockett to Plaintiff regarding that exclusion. *Id.* 17:1-2. Bayer agreed that in that letter, Lockett stated that "derogation/disrespect of Sandy High School, coaches, players, athletic programs was a factor" in the exclusion. *Id.* 17:2-9. As noted above, this language can be interpreted to mean that the exclusion was motivated by Plaintiff's protected speech.

Further, in the Fall of 2015, Bayer wrote a letter to Plaintiff's counsel regarding Plaintiff's access to the school. Steffen Decl. Ex. 4, ECF 31-4. He stated that Plaintiff could return to District property, but that any further incident involving Plaintiff which interfered with the "orderly conduct of the District's educational and activities programs and creates a disturbance to the educational process" would result in Plaintiff being excluded again. *Id.* In his deposition,

Bayer testified that he viewed "continued derogation, disrespect of Sandy High School's coaches, players, and athletic programs in general" to be an example of "creating a disturbance." Bayer Dep. 17:13-20. This sheds additional light on Defendants' motivations for their conduct because it is capable of suggesting that Plaintiff may have been excluded from District property solely for constitutionally protected, but unpopular, speech.

Bayer is arguably a final policymaker for the District. The record on this issue does not appear to have been fully developed. *See Ellins*, 710 F.3d at 1066 ("Whether an official is a policymaker for *Monell* purposes is a question governed by state law") (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988)). But, because he is the District Superintendent, I cannot conclude as a matter of law that he is not a final policymaker and thus, summary judgment for Defendant based on municipal liability is denied.

CONCLUSION

The Court DECLINES to adopt Judge Acosta's Findings & Recommendation [41] to the extent it granted summary judgment to Defendants. Therefore, both Plaintiff's and Defendants' summary judgment motions [30, 32] are denied.

IT IS SO ORDERED.

Dated this ___26___ day of ___Oct_____, 2017

_____
Marco A. Hernandez
United States District Judge